UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

VASHON FLOWERS,

               Petitioner,               Case No. 1:22-cv-981

v.                                  Honorable Paul L. Maloney

BRYAN MORRISON,

               Respondent.

_____/

### OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Vashon Flowers is incarcerated with the Michigan Department of Corrections at the Lakeland Correctional Facility (LCF) in Coldwater, Branch County, Michigan. Following a four-day jury trial in the Muskegon County Circuit Court, Petitioner was convicted of first-degree murder, in violation of Mich. Comp. Laws § 750.316. On March 13, 2020, the court sentenced Petitioner to life imprisonment.

On October 14, 2022, Petitioner filed his habeas corpus petition raising five grounds for relief, as follows:

I.      Mr. Flowers' Fourth Amendment rights were violated because [the] affidavit in support of the search warrant for his cellphone failed to establish probable cause that evidence of a crime would be found on the phone. Trial counsel was ineffective when he failed to file a motion to suppress the results of the forensic examination of the device.

II.     The trial court abused its discretion and violated Mr. Flowers' rights to a fair trial when it permitted the prosecution to present lay opinion testimony about the location of Mr. Flowers' phone when such testimony requires an expert. Alternatively, trial counsel was ineffective for failing to object to the challenged testimony.

III.    Mr. Flowers' right to due process and a fair trial were violated by the admission of several hearsay statements made by the decedent. Alternatively, to the extent he failed to object to some statements, trial counsel was ineffective for failing to object.

IV.    Mr. Flowers' right to due process and a fair trial was violated by the introduction of unfairly prejudicial acts of domestic violence.

V.    The cumulative effect of the errors requires a new trial.

(Pet., ECF No. 1, PageID.7–17.) Respondent asserts that Petitioner's grounds for relief are meritless.[1] (ECF No. 6.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I.    Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

This case arises from the shooting death of [Petitioner's] wife, Jamie Thomas-Flowers, in the early morning hours of May 19, 2019. Thomas-Flowers and [Petitioner] lived together at a residence in Muskegon Heights. The victim's daughter, Paris Jones, and her two-year-old son also lived in the home. On May 18, 2019, at approximately 6:00 p.m., Jones heard the victim and [Petitioner] arguing

---

[1] Respondent also contends that some of Petitioner's grounds for relief are procedurally defaulted. (ECF No. 6, PageID.321–323.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. MaCauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, the Court finds that judicial economy counsels that the better approach is to go directly to a discussion of the merits of Petitioner's claims.

in their bedroom. According to Jones, [Petitioner] told the victim that he was going to the store, and the victim cautioned him not to buy cigarettes. The couple began to argue. Jones could see into the couple's bedroom and it appeared that a physical altercation was taking place. Jones approached the bedroom and saw [Petitioner] grab the victim by her ankle and pull her from the bed to the floor. Jones entered the bedroom and attempted to block the victim from [Petitioner] while telling the couple to calm down. According to Jones, [Petitioner] pushed her out of the way, then jumped on the victim and began choking her as the victim screamed. [Petitioner] eventually stopped his assault on Thomas-Flowers and left the room.

According to Jones, the victim got up and told [Petitioner] "I can't believe you hit me, I can't believe you did this, I can't believe you put your hands on me, we're done, we're over." The victim then told [Petitioner] to take his belongings and leave. While Jones and the victim stood in the kitchen, [Petitioner] walked in and threw a lighter on the ground and the lighter exploded; [Petitioner] then yelled in the victim's face. The victim again told [Petitioner] to leave, and Petitioner left shortly before 7:00 p.m.

Later that night, Jones went to sleep in her bedroom leaving a window open. Sometime later, Jones awoke hearing the victim and [Petitioner] arguing outside her window. She heard [Petitioner] ask the victim where she was going, heard the victim reply, then heard [Petitioner] say, "Oh, hell no you aren't going anywhere." From the sound of the voices, Jones concluded that [Petitioner] and the victim were walking to the front of the house. Jones then heard the front door slam and lock. Jones got out of bed and saw the victim standing in the house, visibly shaken, and trying to peer out the windows without being seen. When Jones asked the victim what was happening, the victim said "He's crazy, he was waiting out there for me. He was just standing out there waiting. I left to go pick up my brother and—and he just jumped from behind a tree and started asking me where I was going and what I was doing." According to Jones, the victim said that [Petitioner] "scared the sh*t out of" her, that she could see that [Petitioner] had a gun hanging out of his pocket, and that he smelled of liquor. Jones testified that she knew that [Petitioner] owned a gun and had seen [Petitioner] carrying the gun on a previous occasion.

While Jones and the victim were talking, [Petitioner] kicked the door of the house. Jones then heard popping and hissing noises as [Petitioner] slashed the tires of the couple's car that the victim drove. The victim yelled out the window at [Petitioner] that she was calling the police. [Petitioner] was no longer at the residence when police arrived. According to Jones, the responding officer told them that he could not do much and left. The victim then locked the front door and put a chair underneath the door handle. The victim told Jones that she was going to watch a movie in her bedroom, and Jones went to bed.

Jones awoke at 6:00 a.m. to the sound of two loud bangs coming from the front door. Jones heard the victim run to the front door and shout "Vashon, just announce yourself" and "Vashon, you don't have to kick the damn door down just announce yourself." Jones heard one or two more kicks to the door, then the sound of wood

cracking. Jones then heard another voice inside the house that she recognized as [Petitioner's] voice, say: "This is what we're doing, Jamie? This is how you're going to do me? This is what you're going to do to me? This is how you're going to do me?" Jones testified that the victim responded "There wasn't anything I could do, you were acting crazy. I had to call the police." Jones testified that [Petitioner] again said "This is what you're going to do? This is what you're going to do to me?" Jones said that the voices sounded as though the victim and [Petitioner] were moving into the living room. Jones picked up her phone and called 911, then heard the victim say: "You don't have to do this Vashon. Please don't do this, you don't have to do this Vashon." Jones then heard four gunshots.

Jones testified that she whispered into the phone to the dispatcher because she was afraid that [Petitioner] would kill her and her son. While talking to the dispatcher, Jones heard a shuffling sound, heard a door open, and then silence. Jones left her bedroom and saw that the chair was no longer barricading the front door, which had been kicked off its hinges. She then saw the victim lying on the floor of the laundry room. Jones again called 911 and reported that the victim had been shot by [Petitioner]. Jones testified that she was sure [Petitioner] was the person who shot the victim because she recognized his voice and heard the victim say his name several times immediately before being shot.

When officers arrived at the home, they observed that the front door had been kicked in and saw a shoe print on the door. Jones met the officers and told them "I think he killed my mom." Jones led the officers to the laundry room where they found the victim's body and four shell casings. The medical examiner determined that the victim's manner of death was homicide, and retrieved four fired bullets and one bullet fragment. Jones later found a tube sock containing 47 nine-millimeter bullets in the living room of the residence. The gun used to shoot the victim was never found.

While the officers investigated, Jones told them that [Petitioner's] brother, Kenyatta Flowers, was standing outside the home talking on a cell phone. When officers approached him, Kenyatta walked away. Officers thereafter spoke with Kenyatta in front of his residence, which was located down the street from the victim's home. Kenyatta allowed the officers to search his home for [Petitioner], but [Petitioner] was not there.

Jones provided [Petitioner's] cell phone number to police officers. In an effort to locate [Petitioner], police obtained a search warrant to do a locational search for [Petitioner's] phone. The locational search indicated that [Petitioner's] phone was likely in Kenyatta's house; police used that information to obtain a search warrant for Kenyatta's house. Meanwhile, officers learned that [Petitioner] had surrendered to police. Police officers then searched Kenyatta's house where they located [Petitioner's] cell phone in a shoe box in the living room. Officers also found shotgun shells and nine-millimeter bullets in the kitchen. Police searched the contents of [Petitioner's] cell phone and extracted data from the phone including an image of a semi-automatic handgun, and text messages from [Petitioner's] phone

that had been sent to and from the victim's phone in the hours before the shooting. Police officers also obtained information from Google showing the location of the phone at various times.

At trial, the prosecution introduced evidence of the text messages [Petitioner] and the victim exchanged in the hours before the shooting. Following voir dire, defense counsel told the trial court that he had no objection to the admission of the text messages. The text messages from the victim to [Petitioner] that night included one stating "This marriage is over. You don't know how [sic] love and that definitely wasn't love and if it was its not enough unfortunately." Another text from the victim included a picture of a computer screen showing the web page divorcewriter.com, and a message stating "You're not helping yourself at all give me a gun if you want to talk—want talk you cut my tires you dumb as hell I never get back with you now police on the way for real Paris scared." At 6:01 a.m. on May 19, 2019, the victim sent a text message to [Petitioner] that said, "Yep, we officially no longer a couple." During that same time period, [Petitioner] sent messages to the victim stating "I love you" and "I love you forever. When you ready for me to come back home let me know. I'm hurt and beat down." At 6:36 a.m., Jones called 911 and reported the gunshots; at 6:39 a.m., Jones again called 911 and reported that the victim had been shot.

*People v. Flowers*, No. 353346, 2022 WL 258246, at *1–3 (Mich. Ct. App. Jan. 27, 2022).

Jury selection for Petitioner's trial began on January 14, 2020. (Trial Tr. I, ECF No. 7-5.) Over the course of four days, the jury heard testimony from numerous witnesses, including Jones, law enforcement officials, an attorney who served as an expert witness regarding gunshot residue, and Petitioner's former girlfriends, who testified about prior acts of domestic violence. (Trial Tr. I, II, III, & IV, ECF Nos. 7-5, 7-6, 7-7, and 7-8.) On January 17, 2020, after only about two hours of deliberation, the jury reached a guilty verdict. (Trial Tr. IV, ECF No. 7-8, PageID.1278.) Petitioner appeared before the trial court for sentencing on March 13, 2020. (ECF No. 7-9.)

Petitioner, with the assistance of counsel, appealed his conviction and sentence to the Michigan Court of Appeals, raising the same four issues identified as habeas ground I-IV above. The court of appeals affirmed Petitioner's conviction and sentence on January 27, 2022. *See Flowers*, 2022 WL 258246, at *1. The Michigan Supreme Court denied Petitioner's application

for leave to appeal on September 6, 2022. *See People v. Flowers*, 978 N.W.2d 826 (Mich. 2022). This § 2254 petition followed.

## II.    Applicable Standards

### A.    AEDPA

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to

6

an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate

courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

**B.    Ineffective Assistance of Counsel**

In three of Petitioner's grounds for relief, he asserts related claims of ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the [Petitioner] resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

8

The [Petitioner] bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the [Petitioner] is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

## III.   Discussion

### A.     Ground I—Fourth Amendment Violation and Related Ineffective Assistance

As his first ground for relief, Petitioner contends that his Fourth Amendment rights were violated because the "affidavit in support of the search warrant for his cellphone failed to establish probable cause that evidence of a crime would be found on the phone." (Pet., ECF No. 7.) Petitioner argues further that trial counsel was ineffective for failing to file a motion to suppress the results of the forensic examination of the phone. (*Id.*)

9

As an initial matter, Petitioner's Fourth Amendment argument is barred by the doctrine set forth in *Stone v. Powell*, 428 U.S. 464 (1976). In *Stone*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *See* 428 U.S. at 494; *see also Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012).

For the *Stone* doctrine to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986); *Markham v. Smith*, 10 F. App'x 323, 326 (6th Cir. 2001).

It is beyond dispute that Michigan has a state procedural mechanism that presents a defendant a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures. *See People v. Margelis*, 217 Mich. 423, 186 N.W. 488 (Mich. 1922). After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts consistently have acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment. *See, e.g.*, *People v. David*, 119 Mich. App. 289, 326 N.W.2d 485, 488 (Mich. Ct. App. 1982). Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, to satisfy the remaining prong of *Stone*, Petitioner must allege facts showing that the state corrective mechanism has somehow broken down. *See, e.g.*, *Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court completely ignored Fourth Amendment claim). The Sixth Circuit pointedly has held that the *Stone* doctrine applies even if the federal court deems the state court determination of the Fourth Amendment claim to have been in "egregious error." *Gilbert*, 763 F.2d at 824 (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)).

Petitioner has not alleged any facts showing that the state's mechanism has broken down. Rather, Petitioner contends that counsel was ineffective for failing to seek suppression of the evidence obtained from the forensic examination of Petitioner's cell phone. That, however, raises a separate ineffective assistance of counsel claim; it does not suggest that the state's mechanism for addressing Fourth Amendment claims has broken down. Indeed, the Michigan Court of Appeals gave Petitioner's Fourth Amendment claim full and proper consideration and concluded that "any error in the introduction of the search history discovered on [Petitioner's] cell phone was harmless." *Flowers*, 2022 WL 258246, at *9. Petitioner raised the issue again in his application for leave to appeal to the Michigan Supreme Court, and that court denied his application. Even if this Court were to disagree with the determination of the Michigan courts, that disagreement would be insufficient to satisfy the second prong of the Sixth Circuit standard. *See Gilbert*, 763 F.2d at 824.

Because Petitioner has failed to demonstrate either prong of *Stone v. Powell*, his Fourth Amendment claim is barred on habeas review. The merits of Petitioner's Fourth Amendment challenge, however, become relevant despite *Stone* because of Petitioner's related ineffective assistance of counsel claim. In *Kimmelman v. Morrison*, 477 U.S. 365, the Supreme Court stated:

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Id.* at 375. For that reason, the Court will review the Michigan Court of Appeals' analysis of Petitioner's Fourth Amendment claim under the AEDPA standard.

The Michigan Court of Appeals agreed with Petitioner that the affidavit in question "fail[ed] to connect [Petitioner's ] cell phone to the crime committed; that is, there are no specific facts in the affidavit that connect information potentially stored on [Petitioner's] cell phone to the shooting." *Flowers*, 2022 WL 258246, at *10. The court noted that "[t]o say generally that criminals often leave evidence of their crimes on their cell phones, without more, is insufficient to establish probable cause that evidence of this particular crime would be found on this particular cell phone." *Id.*

The court of appeals, however, concluded that the admission of evidence from Petitioner's cell phone was harmless, as it did not affect the outcome of trial. *Id.* at *11. The court based that determination on the fact that "[t]he evidence discovered from the search of [Petitioner's] cell phone and admitted at trial was a picture of a gun and text messages between [Petitioner] and the victim." *Id.* At trial, there was "ample evidence" that Petitioner had possessed a gun, and some of the admitted text messages "arguably benefited [Petitioner]." *Id.* Moreover, the evidence supporting Petitioner's conviction—particularly the testimony given by Jones—was "overwhelming." *Id.* Finally, the court of appeals noted that counsel was not ineffective for failing to move for suppression of the evidence seized from Petitioner's cell phone because it was "a legitimate trial strategy." *Id.*

12

Even if this Court were to disagree with the Michigan Court of Appeals' conclusion regarding Petitioner's Fourth Amendment challenge, the court of appeals correctly determined that counsel was not ineffective for failing to file a motion to suppress. The Michigan Court of Appeals primarily addressed the matter using language typically associated with "harmless error" analysis. Under Michigan harmless error jurisprudence, unpreserved nonstructural constitutional error is reviewed under a plain error standard. *People v. Cornell*, 646 N.W.2d 127, 142–43 (Mich. 2002); *People v. Carines*, 597 N.W.2d 130, 143 (Mich. 1999). To prevail, the defendant must show "a plain error that affected substantial rights." *Carines*, 597 N.W.2d at 143. The Michigan Supreme Court assesses whether the error affected the outcome of the proceeding to determine whether the defendant has made the necessary showing. *People v. Davis*, 983 N.W.2d 325, 336–337 (Mich. 2022) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). That is "the same kind of inquiry" the Michigan courts use to determine whether error is harmless: was it "outcome-determinative." *Id*. The Michigan Supreme Court equates "outcome determination" to "prejudice" when separating plain from harmless error, *People v. Vaughn*, 821 N.W.2d 288, 303 (Mich. 2012), and when evaluating the *Strickland* standard for ineffective assistance of counsel, *People v. Harris*, 840 N.W.2d 307, 308 (Mich. 2013).

The impact of an error on the outcome of the proceedings is also the focus of federal harmless error analysis. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting as the standard for determining whether habeas relief if appropriate "whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'"); *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (posing the question as "'Do I, the judge, think that the error substantially influenced the jury's decision?'"); *Brown v. Davenport*, 143 S. Ct. 1510, 1519 (2022) (stating that "a state prisoner . . . must show that the error had a 'substantial and injurious effect or

influence' on the outcome of his trial" (quoting *Brecht*, 507 U.S. at 637)). The appellate court's decision that the error was not outcome determinative is the equivalent of a determination that the error was harmless under *Brecht*. *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995). The determination that any error was harmless under *Brecht* necessarily means that it is not prejudicial under *Strickland*. *See Kyles*, 514 U.S. at 436 (explaining that the *United States v. Agurs*, 427 U.S. 97 (1976), materiality standard, later adopted as the prejudice standard for ineffective assistance of counsel claims, requires the habeas petitioner to make a greater showing of harm than is necessary to overcome the harmless error test of *Brecht*); *see also Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016) ("[O]ur previous analysis of *Strickland* prejudice applies to the assessment of whether the Confrontation Clause violation was harmless error under *Brecht*."); *Bell v. Hurley*, 97 F. App'x 11, 17 (6th Cir. 2004) ("Because we find the error to be harmless [under *Brecht*] Bell cannot meet the prejudice requirement of *Strickland*. . . ."); *Kelly v. McKee*, No. 16-1572, 2017 WL 2831019 at *8 (6th Cir. Jan. 24, 2017) ("Because Kelly suffered harmless error [under *Brecht*] at best, he cannot establish that he suffered prejudice [under *Strickland*].").

*Brown* states that "a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA." 142 S. Ct. at 1520. Accordingly, the Court must defer to that adjudication under § 2254(d)(1) unless the "petitioner persuades [the Court] that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Id*. at 1525 (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)). This is a standard that is intentionally difficult to meet. *See Woods*, 575 U.S. at 316.

Petitioner argues only that "there is a reasonable probability that the results at [his] trial would have been different absent" the evidence from the cell phone. (Pet., ECF No. 1, PageID.8.) Petitioner provides no argument suggesting that no fairminded jurist could come to the conclusion

14

reached by the court of appeals under Supreme Court precedent. Petitioner simply fails to demonstrate that the admission of the evidence obtained from his cell phone had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637, particularly in light of properly admitted evidence at trial that Petitioner possessed a gun, as well as in light of Jones' testimony that she heard Petitioner arguing with the victim, heard four gunshots, and immediately thereafter found the victim dead in the laundry room.

Given Petitioner's failure to persuade the Court that no fairminded jurist could reach the conclusion arrived at by the court of appeals, the Court will defer to the court of appeals' harmless-error determination. The Court's deference to the court of appeals' determination that any error was not outcome determinative necessarily leads to a conclusion that Petitioner cannot establish prejudice under *Strickland* for counsel's failure to file a motion to suppress. Petitioner, therefore, has failed to demonstrate that the court of appeals' rejection of his ineffective assistance claim relating to counsel's failure to file a motion to suppress is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to habeas ground I.

### B.     Ground II—Admission of Lay Opinion Testimony

As his second ground for relief, Petitioner alleges that the trial court violated his right to a fair trial by allowing the prosecution "to present lay opinion testimony about the location of [Petitioner's] phone when such testimony requires an expert." (Pet., ECF No. 1, PageID.11.) Petitioner also faults counsel for not objecting to this testimony. (*Id.*)

During Petitioner's trial, Detective Jason Hartman testified that he had been involved in the search of the home where Petitioner's phone was located. (Trial Tr. III, ECF No. 7-7, PageID.993.) He was also involved in a "subsequent search warrant in regards to Google metadata." (*Id.*, PageID.995.) Detective Hartman explained that the data received from that search

warrant was locational data for the cell phone. (*Id.*, PageID.995–1000.) From that data, law enforcement officials were able to produce a map regarding where Petitioner's phone was on the date of the incident. (*Id.*, PageID.1000–1005.)

On appeal, Petitioner argued that Detective Hartman "was not qualified as an expert by the trial court, and that Hartman's testimony exceeded the scope of lay witness testimony on the subject of cell phone locational information." *Flowers*, 2022 WL 258246, at \*7. He also asserted that counsel was ineffective for failing to object to this testimony. *Id.* The court of appeals rejected Petitioner's arguments, stating:

> On appeal, [Petitioner] challenges two areas of Detective Hartman's testimony as exceeding the scope of lay testimony and warranting qualification as an expert, being Hartman's testimony regarding how the locational data of a cell phone is acquired and Hartman's description of the maps depicting the data that Google provided regarding the location of [Petitioner's] cell phone. The explanation of how cell phone locational information is acquired is based upon technical or other specialized knowledge, and as such is arguably beyond the common knowledge of the average juror, and thus properly the realm of expert testimony. As cell phones have become common devices used daily by virtually all members of our society, however, the technology of cell phones increasingly has entered the realm of common knowledge; it seems fairly certain that most members of the general public are aware that the location of one's cell phone is continually tracked and recorded. In any event, in this case Hartman's testimony did not stray so far into the realm of expert testimony as to result in a miscarriage of justice. Hartman testified about his experience as a police officer with cell phone locational information and the information in this case that explained and supported his testimony regarding the location of [Petitioner's] cell phone at the relevant times.
>
> Hartman's testimony about what the maps showed was based rationally on his perception of the maps and was helpful to a clear understanding of a fact in issue, specifically, the location of [Petitioner's] cell phone in the hours before the shooting. See MRE 701; see also *People v. Fomby*, 300 Mich. App. 46, 50-52; 831 N.W.2d 887 (2013). Because Hartman's testimony rested upon his own rational perceptions and was helpful to explain his own testimony, we perceive no error warranting reversal. Moreover, the record suggests that Hartman could have been qualified as an expert regarding the locational information, rendering the admission of such information in the form of lay testimony harmless error. *See Dobek*, 274 Mich. App. at 76-79.
>
> We also observe that the cell phone locational information did not place [Petitioner] at the scene of the murder at the time of the murder; to the contrary, the locational

16

information indicated that [Petitioner's] cell phone was at his brother's house at the time of the murder. Rather, other considerable evidence presented at trial placed [Petitioner] at the scene of the murder at the time of the murder. We therefore detect no error affecting [Petitioner's] substantial rights, nor does it affirmatively appear that the error complained of has resulted in a miscarriage of justice. MCL 769.26. Accordingly, we find that counsel was not ineffective for failing to object to Hartman's testimony. *See Head*, 323 Mich. App. at 539.

*Flowers*, 2022 WL 258246, at *8–9.

To the extent that Petitioner asserts that the state courts erred in concluding that the admission of Detective Hartman's testimony as lay testimony under Michigan law, he fails to state a claim upon which habeas relief may be granted. State courts are the final arbiters of state law, and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67–68.

It is not inconceivable, however, that evidence properly admitted under state law might still have the effect of rendering Petitioner's trial unfair. State court evidentiary rulings, though, "cannot rise to the level of due process violations unless they offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (internal quotation marks omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

This approach affords the state courts wide latitude for ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Moreover, under the AEDPA, a federal court may not grant relief if it would have decided the evidentiary question differently. A federal court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law, or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "'a Supreme Court case establishing a due process right with regard to the specific kind of evidence' at issue").

Petitioner has not demonstrated that the admission of Detective Hartman's testimony as lay testimony instead of expert testimony violated his due process rights. Petitioner has not cited any Supreme Court authority, and the Court has not located any, suggesting that the admission of such testimony as lay testimony rather than expert testimony violates due process.[2] Moreover, as the court of appeals noted, the introduction of such evidence as lay testimony rather than expert testimony was harmless. On habeas review, an error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637–38. As the court of appeals discussed, the evidence presented showed that Petitioner's cell phone was at his brother's house at the time of the murder, but that other substantial evidence presented at trial,

---

[2] The Sixth Circuit has considered whether cell phone location information requires expert testimony pursuant to the Federal Rules of Evidence but has not suggested that allowing testimony regarding this issue implicates due process. *See United States v. Reynolds*, 626 F. App'x 610, 614 (6th Cir. 2015).

including Jones' testimony, placed Petitioner himself at the scene. Furthermore, the court of appeals concluded that Detective Hartman likely had sufficient expertise to qualify as an expert regarding cell phone location data. *See Flowers*, 2022 WL 258246, at *9.

Because there is no clearly established federal law holding the admission of what should properly be classified as expert testimony as lay testimony violates due process, Petitioner cannot demonstrate that the court of appeals' rejection of his claim concerning Detective Hartman's testimony is contrary to, or an unreasonable application of, clearly established federal law. Likewise, the court of appeals' conclusion that counsel was not ineffective for failing to object to Detective Hartman's testimony is not contrary to, or an unreasonable application of, *Strickland*. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) (noting that "omitting meritless arguments is neither professionally unreasonable nor prejudicial"); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Petitioner, therefore, is not entitled to relief with respect to habeas ground II.

### C.      Ground III—Admission of Hearsay

As his third ground for relief, Petitioner alleges that the trial court erred by allowing the admission of "several hearsay statements made by the decedent." (Pet., ECF No. 1, PageID.13.) Petitioner also faults counsel for not objecting to some of these statements. (*Id.*)

The court of appeals rejected Petitioner's challenges to three "groups of utterances that were introduced into evidence." *Flowers*, 2022 WL 258246, at *3. First, the court of appeals concluded that Jones' testimony concerning utterances the victim made to Petitioner during their argument were not hearsay because they were "offered to show that a quarrel occurred and likely had an effect on [Petitioner] rather than to prove the truth of the matters asserted." *Id.* at *4. Furthermore, the victim's command that Petitioner not purchase cigarettes was not an assertion and, therefore, was not a statement for purposes of Michigan Rule of Evidence 801(a). *Id.*

Petitioner also challenged Jones' testimony regarding declarations the victim made to her after the victim's encounter with Petitioner early on May 19, 2019. *Id.* Jones testified that the victim told her "he's crazy he was waiting out there for me" and that Petitioner had "jumped from behind a tree and started asking me where I was going." *Id.* Jones asked if Petitioner had a gun, and the victim responded, "[y]eah, it's hanging out of his pocket, he smells like liquor." *Id.* The court of appeals concluded that these statements were admissible pursuant to the "present sense impression" hearsay exception set forth in Michigan Rule of Evidence 803(1). *Id.* They were also admissible under the "excited utterance" hearsay exception set forth in Michigan Rule of Evidence 803(2). *Id.* at *4–5.

Finally, Petitioner challenged as hearsay the admission of text messages between Petitioner and the victim from the night of May 18, 2019, and the morning of May 19, 2019. *Id.* at *5. The court of appeals rejected Petitioner's argument, concluding that "messages from the victim to [Petitioner] asserting that the marriage was over, that she did not want to reunite with [Petitioner], and that the police were on the way were not offered to prove that the marriage was over or that the police were on the way." *Id.* Instead, they were offered to show the "likely effect" on Petitioner and that he likely had a motive for shooting the victim. *Id.*

Again, the court of appeals' determination that the utterances at issue were properly admitted under the Michigan Rules of Evidence binds this Court. *See Wainwright*, 464 U.S. at 84; *Bradshaw*, 546 U.S. at 76. As explained above, state court evidentiary rulings "cannot rise to the level of due process violations unless they offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour*, 224 F.3d at 552 (internal quotation marks omitted). The Court may only grant relief if Petitioner shows that the state court's evidentiary rulings were in conflict with a decision reached by the Supreme Court on

a question of law or if the state court decided the evidentiary issue differently than the Supreme

Court did on a set of materially indistinguishable facts. *Sanders*, 221 F.3d at 860. Once again,

Petitioner has not met this difficult standard; he does not even cite any Supreme Court authority

in support of this ground for relief.

There is nothing inherent in the admission of hearsay testimony generally that offends

fundamental principles of justice. In fact,

> [t]he first and most conspicuous failing in [arguing that hearsay testimony violates
> due process] is the absence of a Supreme Court holding granting relief on [that]
> theory: that admission of allegedly unreliable hearsay testimony violates the Due
> Process Clause. That by itself makes it difficult to conclude that the state court of
> appeals' decision "was contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the Supreme Court of the United
> States."

*Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

While hearsay itself is not constitutionally impermissible, in some instances, testimony

regarding out-of-court statements might raise the specter of a violation of the Confrontation

Clause. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be

confronted with the witnesses against him." U.S. Const. amend VI; *Pointer v. Texas*, 380 U.S. 400,

403–05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The

central concern of the Confrontation Clause is to ensure the reliability of the evidence against a

criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding

before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause,

therefore, prohibits the admission of an out-of-court testimonial statement at a criminal trial unless

the witness is unavailable to testify and the defendant had a prior opportunity for cross-

examination. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Not every out-of-court statement admitted at trial, however, implicates the Confrontation

Clause. As the Supreme Court stated in *Crawford*:

21

> The text of the Confrontation Clause . . . applies to "witnesses" against the accused—in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Id.* at 51. The *Crawford* Court had no need to decide whether the Confrontation Clause applies to nontestimonial statements, though the Court suggested, in *dicta*, that the clause does not apply to such statements. Subsequently, the Supreme Court considered the question left open in *Crawford* and explicitly decided that the Confrontation Clause applies only to testimonial hearsay. *See Davis v. Washington*, 547 U.S. 813, 823–24 (2006).

As noted *supra*, the court of appeals held that the first and second set of utterances at issue were not offered to prove the truth of the matter asserted and that the victim's directive that Petitioner not purchase cigarettes was a command, not a statement. In *Crawford*, the Supreme Court explicitly stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)); *see also Williams v. Illinois*, 567 U.S. 50, 70, 104, 125 (2012). The court of appeals' determinations that these utterances were either not statements or were not offered for the truth of the matter asserted, are axiomatically correct as a matter of state law, and they are reasonable applications of federal constitutional law regarding the limits of protection afforded by the Confrontation Clause. Accordingly, the court of appeals' analysis is neither "contrary to" nor an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

The court of appeals concluded that the second set of utterances "fell within . . . established hearsay exception[s]," in this case, the present sense impression exception set forth in Michigan

Rule of Evidence 803(1), as well as the excited utterance hearsay exception set forth in Michigan Rule of Evidence 803(2). *See Flowers*, 2022 WL 258246, at \*4–5. Again, those determinations, made pursuant to state are, are axiomatically correct. Furthermore, the Confrontation Clause is only concerned with "formalized statements, such as affidavits, depositions, prior testimony, and confessions." *Williams*, 567 U.S. at 82. "[I]f a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* at 83–84 (quoting *Michigan v. Bryant*, 562 U.S. 344, 359 (2011)). Here, the victim did not make the statements at issue for the primary purpose of accusing Petitioner or creating evidence of use at trial. Instead, she was in her home when she made the statements to Jones. *See United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) (concluding that statements "made to loved ones or acquaintances . . . are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks"); *see also Ringle v. Berghuis*, No. 1:13-cv-549, 2018 WL 7291442, at \*15 (W.D. Mich. Dec. 7, 2018) (concluding that statements admitted as present sense impressions under Mich. R. Evid 803(1) did not violate the Confrontation Clause because they were not testimonial). Thus, the Confrontation Clause was not implicated by admission of these statements, and the court of appeals' analysis was neither "contrary to" nor an unreasonable application of clearly established federal law.

Likewise, Petitioner has not offered any clear and convincing evidence to rebut the court of appeals' conclusion that counsel strategically chose to not object to the third group of utterances (the text messages) because some of the messages were favorable to Petitioner. Moreover, the court of appeals' conclusions that counsel was not ineffective for failing to object to any of the utterances because they did not constitute hearsay is not contrary to, nor an unreasonable

application of, *Strickland*. *See Coley*, 706 F.3d at 752; *Mahdi*, 522 F.3d at 638. Petitioner, therefore, is not entitled to relief with respect to habeas ground III.

### D.      Ground IV—Admission of Evidence of Domestic Violence

As his fourth ground for relief, Petitioner contends that his rights to due process and a fair trial were violated by the admission of "unfairly prejudicial acts of domestic violence." (Pet., ECF No. 1, PageID.16.) Petitioner suggests that some of these acts occurred more than 10 years before the charged offense and should not have been admitted. (*Id.*)

The court of appeals rejected Petitioner's argument, concluding that the evidence was properly admitted under the Michigan Rules of Evidence and Michigan statutes. *See Flowers*, 2022 WL 258246, at *6–7. The court of appeals specifically concluded that the evidence regarding prior domestic violence was relevant and that its probative value outweighed any unfair prejudice:

> In this case, TG, [Petitioner's] former girlfriend, testified that one day while she and [Petitioner] were dating in 2013, [Petitioner] approached her while she was outside her aunt's house, said "[y]ou going to play me like this?" and then hit TG, causing her to fall against the house. [Petitioner] argues that TG's testimony was not relevant and was unfairly prejudicial. TG's testimony, however, was relevant to demonstrate [Petitioner's] propensity to physically assault his girlfriend. In addition, the statement made by [Petitioner] to TG during the 2013 domestic violence incident was similar to the statement made by [Petitioner] to the victim in this case. Further, [Petitioner] did not demonstrate that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice; here, the evidence did not invite the jury to give marginally probative evidence undue weight. See *id.* Accordingly, the trial court did not abuse its discretion by admitting the evidence.
>
> [Petitioner] also argues that the trial court erred by admitting the testimony of AG, also a former girlfriend of [Petitioner], under MCL 768.27. AG testified that while she and [Petitioner] were dating on May 29, 2008, the two argued, and [Petitioner] began choking her and pushed her against a wall. When [Petitioner] let go of her throat, AG grabbed a knife and ran into a bathroom. [Petitioner] prevented her from closing the bathroom door, took the knife from her, pushed her into the bathtub, then jumped on top of her, cutting her face.
>
> We observe that the trial court did not admit AG's testimony under MCL 768.27b as propensity evidence because the 2008 alleged assault occurred more than 10

years before the charged offense. *See* MCL 768.27b(4). However, the trial court found the evidence admissible under MCL 768.27, which provides:

> In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant.

> [Petitioner] argues that AG's testimony was improperly admitted under MCL 768.27 as propensity evidence. [Petitioner] references statements made in the prosecutor's closing argument, which [Petitioner] alleges amount to an improper propensity inference based on AG's testimony. The trial court, however, instructed the jury that AG's testimony could not be used to determine [Petitioner]'s propensity to commit crimes. The trial court instructed the jury that the evidence presented by AG could be considered only to show that the [Petitioner] had a reason to commit the crime, that the [Petitioner] specifically meant to assault [AG], that the [Petitioner] acted purposefully and not by accident or mistake or because he misjudged the situation, and that the [Petitioner] used a place, system, or characteristic scheme that he has used before or since. We presume that the jury followed their instructions. *People v Stevens*, 498 Mich. 162, 177; 869 N.W.2d 233 (2015). Although the prosecutor may have attempted to make an improper propensity argument using AG's testimony, the trial court did not abuse its discretion by admitting the evidence and properly instructed the jury as to the limits of its use.

*Flowers*, 2022 WL 258246, at *6–7.

As an initial matter, to the extent that Petitioner asserts that the state courts erred in admitting this evidence under the Michigan Rules of Evidence and Michigan statutes, he fails to state a claim upon which habeas relief may be granted. The court of appeals' conclusion that such evidence was admissible under state law is binding on this Court. *See Wainwright*, 464 U.S. at 84; *see also Bradshaw*, 546 U.S. at 76.

It may be that certain evidence might still render a trial unfair whether or not it is properly admitted under state law. A state court's ruling admitting or excluding evidence, however, "cannot rise to the level of due process violations unless [it] 'offend[s] some principle of justice so rooted

in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (second alteration in original) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

That latitude is increased further by the deferential standard of review under the AEDPA. This court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "a Supreme Court case establishing a due process right with regard to the specific kind of evidence at issue").

Petitioner has not met this high standard because he fails to identify any clearly established Supreme Court precedent that would preclude admission of the evidence at issue. First, the Michigan Court of Appeals determined that the domestic violence evidence was directly relevant to the matters at issue in Petitioner's criminal prosecution. The Sixth Circuit Court of Appeals notes that "[t]he Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012).

Second, even absent that direct relevance, there is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity

evidence in the form of "prior bad acts" evidence. *Estelle*, 502 U.S. at 67. In *Estelle*, the Supreme

Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502

U.S. at 75. The Court stated in a footnote that because it need not reach the issue, it expressed no

opinion as to whether a state law would violate due process if it permitted the use of prior crimes

evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court

has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence,

*see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681

(1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found

that "[t]here is no clearly established Supreme Court precedent which holds that a state violates

due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329

F.3d at 512.

Because there is no clearly established federal law holding that evidence that is relevant

violates due process simply because it is prejudicial and there is no clearly established federal law

holding that "prior bad acts" evidence violates due process, Petitioner cannot demonstrate that the

court of appeals' rejection of his claim concerning the admission of testimony regarding domestic

violence is contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, Petitioner is not entitled to relief on habeas ground IV.

  **E.  Ground V—Cumulative Error**

As his last ground for relief, Petitioner contends that "[t]he cumulative effect of the errors

requires a new trial." (Pet., ECF No. 1, PageID.17.) The court of appeals summarily dismissed this

claim, noting that "when no error has been established there can be no cumulative effect of errors

warranting reversal. Because [Petitioner] in this case has not demonstrated error by the trial court,

no cumulative effect of error exists." *Flowers*, 2022 WL 258246, at *9 (internal citation omitted).

Under the AEDPA, a court may only grant habeas relief based on a misapplication of Supreme Court law. *See Bailey*, 271 F.3d at 655. The Sixth Circuit has noted that "[i]ndividually non-prejudicial errors, when taken together, may result in a fundamentally unfair trial that violates a defendant's due process rights." *United States v. Stuckey*, 253 F. App'x 468, 492 (6th Cir. 2007) (citing *United States v. Pierce*, 62 F.3d 818, 834–35 (6th Cir. 1995)); *see also Cockream v. Jones*, 382 F. App'x 479, 486 (6th Cir. 2010) (noting that "only actual *errors* may combine to generate cumulative prejudice"); *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (setting forth that aggregated harmless errors require reversal in situations where "the combined effect . . . was to prejudicial as to render [a] trial fundamentally unfair"). Here, however, Petitioner has not convinced this Court that any harmless errors that occurred during his criminal proceedings had that effect. Petitioner, therefore, is not entitled to relief on habeas ground V.

## IV.    Pending Motion

Petitioner has filed a motion for an order vacating his conviction, which he calls a "notice of malicious prosecution." (ECF No. 15.) Petitioner's motion focuses on the court of appeals' conclusion that the search and seizure of Petitioner's cell phone violated the Fourth Amendment, and that counsel should have filed a motion to suppress any evidence seized from the phone. Essentially, Petitioner reiterates habeas ground I in this motion. As discussed *supra*, Petitioner is not entitled to habeas relief. Accordingly, his motion for an order vacating his conviction (ECF No. 15) will be denied.

## V.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a

28

certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

**<u>Conclusion</u>**

The Court will enter a judgment denying the petition, as well as an order denying a certificate of appealability and Petitioner's motion for an order to reverse conviction (ECF No. 15).

Dated:   <u>October 19, 2023</u>              <u>/s/ Paul L. Maloney</u>
                                    Paul L. Maloney
                                    United States District Judge